David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
212 Marine Street, Suite 100
Santa Monica, CA 90405
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Yitzchak H. Lieberman (SBN 277678)
ylieberman@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
7400 Hollywood Blvd, #505
Los Angeles, CA 90046
Telephone: (917) 657-6857
Facsimile: (877) 501-3346

*Attorneys for Plaintiffs Lynn Slovin,
Samuel Katz, Jeffery Price, and
Justin Birkhofer, on their own
behalf, and on behalf of all others
similarly situated*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYNN SLOVIN, an individual, on her own behalf and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SUNRUN, INC., a California corporation, CLEAN ENERGY EXPERTS, LLC, a California limited liability company doing business as SOLAR AMERICA, and DOES 1-5, inclusive, <br><br> Defendants. | Case No. 4:15-cv-05340-YGR <br><br> (Assigned to Hon. Yvonne Gonzalez Rogers) <br><br> **THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT AND THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT** <br><br> **JURY DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiffs LYNN SLOVIN, SAMUEL KATZ, JEFFERY PRICE, and JUSTIN

BIRKHOFER ("Plaintiffs"), make this complaint against Defendants SUNRUN, INC., a

California corporation, and its subsidiary, CLEAN ENERGY EXPERTS LLC, a California

limited liability company doing business as SOLAR AMERICA, and Does 1 to 5 (collectively,

"Defendants"). Plaintiffs' allegations as to their own actions are based on personal knowledge. The other allegations are based on their counsel's investigation, and information and belief.

**Introduction**

1.    Defendants operate within the burgeoning solar energy industry. A critical part of Defendants' solar energy business is generating qualified leads through telemarketing campaigns promoting solar energy products and services.  Defendants deliver these leads in real time (within 30 to 60 seconds) to solar providers, including Sunrun, which then convert these leads into sales.

2.    Defendants accomplish their telemarketing campaigns by making unsolicited robocalls (*i.e.*, using an automatic dialing system and/or prerecorded or artificial voice calls) to telephone numbers, often without the prior express consent of the persons using those telephone numbers. In addition, Defendants make calls to telephone numbers listed on the national Do-Not-Call registry as well as to individuals who request to be placed on an internal Do Not Call lists.

3.    These practices violate the Telephone Consumer Protection Act (47 U.S.C. § 227) ("TCPA"). The TCPA was enacted to protect consumers from intrusive automated telemarketing practices like the robocalls made to Plaintiffs and members of the Classes. By making these robocalls and ignoring the national Do-Not-Call registry and consumers' repeated requests to stop calling, Defendants caused Plaintiffs and members of the Classes actual harm.

4.    This harm includes the aggravation, nuisance, and invasion of privacy that results from the receipt of unsolicited and harassing telephone calls, intrusion upon and occupation of the capacity of the telephones of Plaintiffs and Class Members, wasting the Plaintiffs and Class Members' time and money by having to retrieve voice messages, answer calls, and determine the identity of the callers, and the interruption and distraction that results from these activities.

5.    In response to Defendants' unsolicited telemarketing calls, Plaintiffs filed the instant lawsuit and seek an injunction requiring Defendants to cease all unsolicited telephone calling activities and an award of statutory damages to the members of the Classes under the TCPA, together with costs and reasonable attorneys' fees.

**Parties**

6.     Plaintiff Lynn Slovin ("Plaintiff Slovin") is a natural person and a resident of Baltimore, Maryland. At all relevant times Plaintiff Slovin was the sole user, subscriber, owner, and possessor of the cellular telephone number at issue.

7.     Plaintiff Samuel Katz ("Plaintiff Katz") is a natural person and a resident of Bellingham, Massachusetts. At all relevant times Plaintiff Katz was the sole user, subscriber, owner, and possessor of the cellular telephone number at issue.

8.     Plaintiff Jeffery Price ("Plaintiff Price") is a natural person and a resident of Oxnard, California. At all relevant times Plaintiff Price was a user, subscriber, owner, and possessor of the residential number at issue.

9.     Plaintiff Justin Birkhofer ("Plaintiff Birkhofer") is a natural person and a resident of West Columbia, South Carolina. At all relevant times Plaintiff Birkhofer was the sole user, subscriber, owner, and possessor of the cellular telephone number at issue.

10.     Defendant Sunrun Inc. ("Sunrun") is a Delaware corporation with its principal place of business located at 595 Market Street, 29th Floor, San Francisco, California 94105. Sunrun represents that it is the largest dedicated residential solar company in the United States. It develops, owns, manages, and sells residential solar energy systems in Arizona, California, Colorado, Connecticut, Hawaii, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Oregon, Pennsylvania and South Carolina.

11.     Defendant Clean Energy Experts, LLC ("Clean Energy") is a California limited liability corporation with its principal place of business located at 595 Market Street, 29th Floor, San Francisco, California. Solar America is a fictitious business name registered to Clean Energy.  Clean Energy operates the solaramerica.com and solaramerica.org websites, among various other websites.

12.     Clean Energy's core business is marketing to consumers, generating live leads, filtering and qualifying in real-time, and distributing leads to Sunrun and third party solar providers.  See https://www.cleanenergyexperts.com/services-leads-marketing/lead-generation-software/ (last visited March 23, 2016).

---

13.     Clean Energy operates as a subsidiary of Sunrun. According to Sunrun's Form 10K filing dated March 11, 2016, Clean Energy's operations have been fully integrated into Sunrun's operations following the acquisition of Clean Energy by Sunrun in April 2015:

> For the year ending December 31, 2015, the contribution of the acquired business to the Company's total revenues was $16.9 million, as measured from the date of the acquisition. The portion of total expenses and net income associated with the acquired business was not separately identifiable due to the integration with the Company's operations.

(*available at* http://www.sec.gov/Archives/edgar/data/1469367/000156459016014482/run-10k_20151231.htm (last visited March 23, 2016)).

14.     Sunrun exercises direct management and control over telemarketing employees that qualify solar customer leads by phone under the Sunrun, Clean Energy and Solar America trademarks and brands, including directly overseeing and managing call center operations and staff. Sunrun also monitors performance metrics, and provides processes and scripts for telemarketers. Plaintiffs are currently ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants sued herein under the fictitious names Does 1 through 5, inclusive, and therefore, sues such Defendants by such fictitious names. Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of said fictitiously named Defendants when their true names and capacities have been ascertained. Plaintiffs are informed and believe and based thereon allege that each of the fictitiously named Doe Defendants is legally responsible in some manner for the events and occurrences alleged herein, and for the damages suffered by Plaintiffs.

15.     Plaintiffs are informed and believe and based thereon allege that all defendants, including the fictitious Doe Defendants, were at all relevant times acting as actual agents, conspirators, ostensible agents, partners and/or joint venturers and employees of all other defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, and joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-Defendants; however, each of these allegations are deemed "alternative" theories whenever not doing so would result in a contradiction with the other allegations.

16. All Defendants, including Does 1 through 5, are collectively referred to as "Defendants."

17. Whenever this complaint refers to any act of Defendants, the allegations shall be deemed to mean the act of those defendants named in the particular cause of action, and each of them, acting individually, jointly and severally, unless otherwise alleged.

**Jurisdiction and Venue**

18. For the reasons stated in *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740 (2012), the Court has federal subject matter jurisdiction under 47 U.S.C. § 227.

19. The Court has personal jurisdiction over Defendants because Defendants' principal place of business is within this District and Defendants conduct significant business transactions within this District.

20. Venue is also proper before this Court under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

21. All allegations in this complaint are based on information and belief and/or the documents and information currently available, and are such that additional evidentiary support and detail will be forthcoming after a reasonable opportunity for further investigation or discovery.

**Intradistrict Assignment**

22. A substantial part of the events which give rise to the claim occurred in San Francisco County. Under Local Rule 3-2(c), (d), this civil action should be assigned to the San Francisco division of the Northern District of California.

**The Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227**

23. In 1991, Congress enacted the TCPA, in response to a growing number of consumer complaints regarding certain telemarketing practices.

24. The TCPA regulates, among other things, the use of automated telephone equipment, or "autodialers." Specifically, the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an

emergency or the prior express consent of the called party. Further, section 227(b)(1)(B) prohibits initiating telephone calls to "residential telephone line[s] using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," unless the call is for an emergency, or is to collect a debt owed to or guaranteed by the United States.

25.     The FCC, the agency Congress vested with authority to issue regulations implementing the TCPA, has defined prior express consent in 47 C.F.R. § 64.1200(f)(8) as "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered."

26.     Under the TCPA, the burden is on defendants to demonstrate prior express written consent.

27.     Congress found that "automated or pre-recorded calls are a nuisance and an invasion of privacy, regardless of the type of call" and decided that "banning" such calls made without consent was "the only effective means of protecting telephone consumers from this nuisance and privacy invasion." Pub. L. No. 102-243, §§ 2(10-13) (Dec. 20, 1991), *codified at* 47 U.S.C. § 227. *See also Mims v. Arrow Fin. Servs., L.L.C.*, 132 S. Ct. 740, 744, 181 L. Ed. 2d 881 (2012) ("The Act bans certain practices invasive of privacy").

28.     Regardless of whether there exists prior express consent, the FCC rules allow consumers to make "do-not-call" requests that companies must track in internal do-not-call lists. 47 C.F.R. § 64.1200(c); 16 C.F.R. § 310.4(b)(1)(iii)(B). Telemarketers must provide consumers with an automated opt-out mechanism that "must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call." 47 C.F.R. 64.1200(b)(3). This mechanism was enacted to empower consumers to "stop receipt of unwanted autodialed or prerecorded telemarketing calls to which they never consented." Telephone Consumer Protection Act of 1991, Final Rule, 77 Fed. Reg. 34233, 34239 (June 11, 2012).

## Defendants' Solar Lead Generation Business

29.     Sunrun represents that it is the largest dedicated residential solar company in the United States. It develops, owns, manages, leases and sells residential solar energy systems in thirteen (13) states. *See* https://www.sunrun.com/solar-by-state (last visited July 12, 2016).

30.     Sunrun promotes solar energy products and service to homeowners using savings on utility bills and the federal Solar Tax Credit (which was set to expire on December 31, 2016 but has since been extended) as selling points. *See* http://www.sunrun.com/solar-savings (last visited Nov. 29, 2015); http://www.sunrun.com/solar-lease/cost-of-solar/federal-solar-incentives (last visited Nov. 29, 2015).

31.     Solar companies, including Sunrun, utilize telemarketing within their marketing and sales process in order to effectively promote their products and services to potential customers (solar energy leads) and close deals. In fact, telemarketing and lead generation is a critical part of the solar energy industry: converting a lead into a buying solar customer typically requires multiple calls from a sales person to the lead. *See* https://www.cleanenergyexperts.com/2013/11/06/solar-telemarketing-and-the-telephone-consumer-protection-act-of-1991/ (last visited Nov. 29, 2015).

32.     In April 2015, Sunrun acquired Clean Energy, the largest solar lead generation company, for $25.0 million in cash and 1.9 million shares of common stock. Clean Energy generated more than one million leads since 2013. In addition, Clean Energy may receive an additional $9.1 million in cash and 600,000 shares of common stock in April 2017 as long as Clean Energy meets certain sales targets as well as continued employment of certain key employees acquired in the transaction. *See* Sunrun Form 424B4 filed with the SEC on August 5, 2015 (*available at* https://www.sec.gov/Archives/edgar/data/1469367/000119312515278786/d880891d424b4.htm (last visited Nov. 20, 2015).

33.     Sunrun's acquisition of Clean Energy enabled Sunrun to generate leads in-house, to exercise direct control over solar telemarketing campaigns, and to monetize the solar energy leads in two ways: by converting them into purchasing solar energy customers and by selling the

leads directly to its partners or other providers in the solar industry. *See* Sunrun Form 424B4 filed with the SEC on August 5, 2015. *See* Sunrun Form 10K filed with the SEC on March 11, 2016 (*available at* http://www.sec.gov/Archives/edgar/data/1469367/000156459016014482/run-10k_20151231.htm (last visited March 23, 2016).

34.     Since Sunrun acquired Clean Energy, it has increased revenue significantly. See Sunrun's Form 10-Q filed with the SEC on May 13, 2016 ("Revenue from solar energy systems sales increased by $24.4 million compared to the prior year period due to higher sales volume in [Sunrun's] retail channel…[P]roduct sales increased by $12.4 million compared to the prior period due to increased volume of solar-related products revenue due primarily to growth from sales to [Sunrun's] channel partners and due to [Sunrun's] acquisition of Clean Energy Experts, LLC ("CEE") in April 2015.") available at https://www.sec.gov/Archives/edgar/data/1469367/000156459016019375/run-10q_20160331.htm (last visited July 7, 2016).

35.     Defendants, directly and through their agents, systemically employ an invasive method of telemarketing solicitation known as "robocalling" to generate and deliver leads. Defendants and their agents use automatic dialing systems and/or prerecorded and artificial voice message to place uninvited telemarketing calls to prospective clients in a given geographic area. When the prospective client (such as a homeowner) answers the phone, Defendants promote the cost savings of converting to solar energy and offer to provide the homeowner with quotes from local installers, dealers or contractors. Defendants essentially "prime[] the sales process for a [solar] company to convert these leads into closed sales deals." See https://www.cleanenergyexperts.com/solar-energy-and-home-improvements-leads/qualified-sales-prospects-residential-and-commercial (last visited Nov. 18, 2015).

36.     Defendants then deliver these leads to solar companies within 30 to 60 seconds:

> **Real-time Delivery**. Lead quality degrades over time. We utilize our technology platform to deliver leads to you in real-time with no delay. What does this mean? Once a lead is qualified by our proprietary process it is delivered to you within 30 seconds to 1 minute by email and/or sent directly into your CRM (Customer Relationship Management) system. We can easily integrate with any CRM system such as SalesForce, NetSuite,

Microsoft Dynamics or your own custom CRM.  We believe time is of the essence to have your sales teams act on the leads and achieve superior success rates!

*See* https://www.cleanenergyexperts.com/solar-energy-and-home-improvements-leads/live-real-time-delivery (last visited Nov. 18, 2015) (emphasis in original).

37.     Over 500 solar companies receive leads from Clean Energy. *See* https://www.cleanenergyexperts.com/solar-energy-and-home-improvements-leads/frequently-asked-questions (last visited Nov. 29, 2015).

38.     The leads can be exclusive or non-exclusive.  For non-exclusive leads, Clean Energy may sell the lead to up to three additional companies.  Solar companies pay per lead regardless of whether the lead ultimately results in a sale.  See Clean Energy Lead Purchase Agreement available at https://www.cleanenergyexperts.com/terms120m420vp/ (last visited March 24, 2016).

39.     Sunrun recognizes revenue generated from selling these leads to solar providers at the time the lead is delivered. *See* Sunrun Form 10K filed with the SEC on March 11, 2016 (*available at* http://www.sec.gov/Archives/edgar/data/1469367/000156459016014482/run-10k_20151231.htm (last visited March 23, 2016).

40.     Clean Energy claims that "[its] best clients actually sometimes only request the contact information (because they know we are already qualifying the project information and interest level of the lead)."  This contact information includes the "name, address, city, state, zip code, phone number and email" of the prospective client. See http://www.cleanenergyexperts.com/solar-energy-and-home-improvements-leads/qualified-sales-prospects-residential-and-commercial (last visited Nov. 29, 2015).

41.     Solar companies, including Sunrun, then convert leads into sales by immediately contacting the prospective client and doing so repeatedly over the course of the next few days.

**Defendants' Telemarketing Campaigns**

42.     Defendants directly and through their third party vendors, including but not limited to Lead Genesis Partners, LLC ("Lead Genesis"), Mediamix365, and Epath Digital, formerly known as Webnet Consulting, Inc. doing business as Epath Media ("Epath Media");

Solomon and Associates LLC doing business as Solar Media Team ("Solar Media Team") (collectively, the "Agents")[1], make calls, including the calls made to Plaintiffs and Class Members, *en masse* using a prerecorded or artificial voice and/or automatic telephone dialing systems (such as a "predictive" dialer) which automatically places calls without human intervention until the called party answers the call, at which time the dialer attempts to connect the called party with a human representative or an automated prompt.

43.     Defendants, as principals or partners, use the Agents to conduct their core business of lead generation by having Agents place illegal telemarketing calls to homeowners.

44.     The Agents conduct aggressive telemarketing campaigns for the purpose of delivering leads to Defendants.

45.     The Agents call homeowners using fictitious solar-related business names, which names are known by Defendants prior to the calls.[2] During the calls, the Agents ask homeowners a series of questions from a script provided to them and preapproved by the Defendants. These questions are dictated by Defendants' criteria, such as the persons' credit score, average monthly electric bills, roof shading, as well as other personal and demographic information.

46.     If the potential customer answers the questions, the Agent posts the lead data, i.e., the potential customer's personal, demographic, and contact information directly into Defendants' customer relationship management software or database (CRM).  These lead post submittal forms are preapproved by Defendants, and are designed based on Defendants' criteria and types of information they require to be posted to their CRMs.

47.     Defendants' Agents make the calls on behalf of Defendants and are encouraged to "live transfer" or "warm transfer" the solar lead to Defendants during the call with the potential solar customer, whenever possible.

48.     In a typical "live transfer" or "warm transfer," Defendants' Agents "qualify" the

---

[1]     Plaintiffs reserve the right to identify additional Agents as they are learned through discovery. To date, Defendants have failed to identify all of their vendors that called Plaintiffs and Class Members on Defendants' behalf and for Defendants' benefit.

[2]     Some of these fictitious business names are registered fictitious business names and others do not appear to be registered. Many of these names give consumers the false impression that they are working with non-profit organizations or government solar programs.

lead by reading the script, posting the information obtained directly into Defendants' CRM (including a link to a recording of the call), and connecting the lead with Defendants' call center employees. Defendants' Agents accomplish this by "conferencing" Defendants' call center employees directly on the line with the solar lead. Defendants' Agents then disconnect from the line and allow Defendants to "prime the sales process" by asking qualifying questions and scheduling an appointment for a solar consultant (from Sunrun or another solar company) to visit the potential customers' home.

49. Defendants' direct and control the manner and methods in which their Agents place calls for the purpose of generating leads on Defendants' behalf and for Defendants' benefit.

50. Defendants require their Agents to obtain written approval of all telemarketing scripts used to generate leads on Defendants' behalf or for their benefit.

51. Defendants have access to all phone numbers called by Agents on Defendants' behalf or for their benefit.

52. Defendants have access to recordings of all calls made by Agents on their behalf or for their benefit.

53. Defendants have access to the caller IDs used for all calls made by Agents on Defendants' behalf or for their benefit.

54. Defendants require that Agents provide Defendants with all names used in telemarketing campaigns on Defendants' behalf or for their benefit.

55. Defendants provide their Agents with information about Defendants' proprietary information, including Defendants' pricing requirements, geo-targeting information, roofing requirements, and which electric power companies Defendants work with.

56. Defendants are so involved in the call that the sole function of the Agent is to physically place a call, read a preapproved script, and either transfer the call or provide the lead data directly into Defendants' CRM. This job can be done by a robot, and at times appears to be conducted in part by a highly sophisticated computer program with artificial voice and voice recognition capabilities.

57.     Defendants and their Agents systemically ignore the National DNC lists and Plaintiffs and Class Members' requests to be removed from company specific DNC lists.

58.     Defendants and their Agents systemically fail to obtain consent before placing calls to potential solar customers, including Plaintiffs and the Class Members.

59.     Defendants reserve the right to pause or terminate their relationships with their Agents for non-compliance with TCPA rules and regulations.

60.     Defendants knew or should have known that their Agents systemically violate the TCPA from their strict controls, ability to audit and perform quality controls, from the sheer volume of robocall and DNC complaints against Solar America, Clean Energy, and Sunrun, and from the Agents' statements that they are not governed by certain TCPA rules because they are not selling anything.

61.     Defendants supervise, monitor, oversee, and actively participate in the telemarketing campaigns from the time the calls are placed on their behalf through the time the lead is converted into a sale by Sunrun or by another solar company.

62.     Defendants compensate their Agents for leads generated on Defendants' behalf in one of two ways: revenue sharing and on a cost per lead basis.  In the revenue sharing payment type, Defendants' Agents share in the gross revenues obtained by Defendants from the sale of those leads to other solar companies.

63.     Defendants require that all leads submitted to Defendants be exclusive to Defendants. Defendants prohibit their Agents from providing the lead to other third parties. Defendants also prohibit their Agents from contacting the lead for at least 90 days from the date of submission of the lead to Defendants.  All leads provided to Defendants by their Agents are co-owned by Defendants and their Agents.

64.     Defendants retain the right to reject or return leads that do not pass Defendants' quality control process.

65.     Defendants knew or should have known that their Agents were engaged in illegal telemarketing. Irrespective of that fact, once they obtained actual knowledge of the unlawful practices, they failed to take the steps necessary to halt the misconduct.

66.     Defendants knew that their Agents were violating the TCPA as both Defendants and their Agents, in practice, do not obtain the requisite consent required under the TCPA.

67.     Defendants' role as a telemarketer/lead generator and their extensive involvement in the placing of calls to Plaintiffs and Class Members, including providing Defendants' Agents with specific and comprehensive written instructions as to timing and the manner of the calls, render Defendants directly liable for initiating calls to Plaintiffs and Class Members.

68.     In the alternative, Defendants' third party vendors were at all relevant times acting as actual agents, conspirators, ostensible agents, partners and/or joint venturers and employees of Defendants, and the acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of Defendants.

69.     Each of these allegations are "alternative" theories of liability whenever not doing so would result in a contradiction with the other allegations.

70.     Plaintiffs and Class Members experiences receiving calls from Defendants and their Agents are common. They all received multiple, incessant, uninvited calls with a long pause at the beginning of the call and/or a prerecorded/artificial voice.  The callers asked a series of scripted questions about whether the Plaintiffs and Class Members qualify for solar for the purpose of live transferring the call directly to Defendants and to send the lead to Defendants. The "called from" numbers were constantly changing, often local numbers, that could not be called back or which did not connect to any company representative when dialed. The calls were made irrespective to whether Plaintiff and Class Members were on the National Do Not Call Registry or they asked that the calls stop.

71.     During calls identified in this complaint, there was a significant pause before Defendants' representative started speaking, which is a telltale sign that Defendants used a predictive dialer to make the call:

> Predictive dialers initiate phone calls while telemarketers are talking to
> other consumers . . . In attempting to "predict" the average time it takes
> for a consumer to answer the phone and when a telemarketer will be free

> to take the next call, predictive dialers may either "hang-up" on consumers
> or keep the consumer on hold until connecting the call to a sales
> representative, resulting in what has been referred to as "dead air."

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 2003 Report and Order*, CG Docket No. 02-278, FCC 03-153, ¶ 146, 18 FCC Rcd. 14014, 14101, 2003 WL 21517853, *51 (July 3, 2003), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-03-153A1.pdf ("*2003 Report and Order*").

72.     Defendants and their Agents placed calls alleged in this complaint with predictive dialers. Predictive dialers constitute an automatic telephone dialing system; they are capable of storing, producing, and dialing any telephone number, and are capable of storing, producing, and dialing telephone numbers using a random or sequential number generator. Further, no human manually entered Plaintiffs and Class members' cellular telephone number when Defendants made the calls alleged below. Rather, the predictive dialer(s) electronically dialed Plaintiffs and Class members' telephones in an automated fashion. The predictive dialers otherwise constitute an "automatic telephone dialing system" under the meaning of 47 U.S.C. § 227(a)(1).

73.     Defendants and their Agents' calls were transmitted using technology capable of generating hundreds of thousands of telemarketing calls per day.

74.     None of the telephone calls alleged in this complaint constituted calls for emergency purposes as defined by 47 U.S.C. § 227 (b)(1)(A)(i).

75.     None of the Plaintiffs or Class members consented to receive calls from Defendants or their Agents.

76.     Defendants and their Agents made, and continue to make, these telemarketing calls to individuals nationwide without their prior written express consent to do so.

**Plaintiff Slovin's Individual Allegations**

77.     On or about January 17, 2007, Plaintiff Slovin placed her cell phone number on the "national Do-Not-Call registry."

78.     Beginning in or about September and through November 2015, Plaintiff Slovin received multiple telephone calls to her cell phone from numbers that she believes were from

Defendants. Often, these calls originated from different numbers, including local Maryland numbers.[3]

79. Plaintiff Slovin received at least four calls (including on October 26, October 27, October 28, and November 2, 2015) from a telephone number where the caller identified them self as calling from Solar America.

80. Discovery and investigation, to date, indicates that Defendants' Agent, Lead Genesis Partners, LLC placed these calls, from one of their call centers.[4]

81. On some of the occasions when Plaintiff Slovin answered her cell phone, she heard several digital "clicks," a pause, and then a voice on the phone. At times, Plaintiff Slovin was unable to determine if the voice was artificial or live. On other occasions, the calls were disconnected after the pause. One of these calls resulted in a voicemail consisting of unintelligible machine sounds.

82. On still other occasions, the caller identified herself as Sarah from Solar America and then, in a generic or scripted fashion, proceeded to promote solar energy products and services as a way to save money. The caller attempted to make an appointment for a solar company to provide Plaintiff Slovin with a quote.

83. During these calls, Plaintiff Slovin instructed Defendants to stop calling, asked to be placed on an internal "Do Not Call List" and further advised Defendants that her cellular telephone number was on the "national Do-Not-Call registry."

84. Despite Plaintiff Slovin's efforts to cease Defendants' calls, she continued to receive unsolicited phone calls from Defendants.

85. Prior to the calls, Plaintiff Slovin had no contact with Defendants or their Agents and did not consent to receive these telephone calls.

---

[3] Telemarketers cause a local number to appear on the recipients' caller ID in order to increase the likelihood that the recipient will pick up the call. For example, Velocify, which partners with Clean Energy, offers automated outbound dialer software that gives users the ability to "[o]perate like a local business and boost contact rates by calling prospects from their own area code." *See* http://pages.velocify.com/rs/522-DJL-243/images/velocify-pulse-communication.pdf (*last visited* Nov. 29, 2015) and Exhibit 1 attached hereto.

[4] Plaintiffs reserve the right to identify additional entities that called Plaintiffs Slovin, Katz, Price, Birkhofer on behalf of and for the benefit of Defendants during the Class Period in the event such entities and dates are identified through discovery.

86.     After receiving these calls, Plaintiff Slovin received an email on December 11, 2015 promoting Sunrun's solar products.

87.     The Federal Trade Commission has over 2,500 telemarketing complaints filed against Solar America from December 1, 2014 through November 30, 2015 alone.

88.     In these complaints, other individuals complain that they also received calls from Solar America from the same number that called Plaintiff Slovin.  The calls occurred on the same dates (October 27 and November 2) and shortly thereafter on November 4 as Plaintiff Slovin received calls from Solar America.

89.     The telephone numbers which showed up on Plaintiff Slovin's phone as the calling number were, when called back, either non-operating numbers or numbers that have automated prompts that do not connect to a company representative.

90.     Plaintiff Slovin was damaged by these calls. She found these repeated unsolicited calls to be intrusive and harassing, as they diverted attention away from her daily activities. Plaintiff Slovin put herself on the national Do-Not-Call registry specifically to avoid telemarketing calls. Plaintiff Slovin's privacy was invaded when she received repeated calls from Solar America (or its agents) from different numbers, including local numbers. Plaintiff Slovin's privacy was further invaded by intrusive questioning asking for personal information such as name, address, email, FICO score, among others.

**Plaintiff Samuel Katz's Individual Allegations**

91.     On or about January 3, 2013, Plaintiff Katz placed his cell phone number on the "national Do-Not-Call registry."

92.     Beginning in or around July 2015 and through February 2016, Plaintiff Katz received multiple calls on his cell phone on behalf of and for the benefit of Defendants.  All of these calls began with dead air on the line.  For example, Plaintiff Katz received calls on July 27, 2015 and on August 4, 2015.

93.     On August 18, 2015, Plaintiff Katz received a call from a local Massachusetts number on his cell phone. After a long pause, a live person came on the line.  She initially did not identify herself.  She stated she was calling "in reference to the Massachusetts solar

initiative." During the call, the caller stated that she worked for Solar Nation but was calling on behalf of Sunrun.  When Plaintiff Katz stated that he never consented to the call under the TCPA, in a scripted fashion, she proceeded to explain that her company was just placing a "courtesy call" and was not subject to the TCPA because there were no out of pocket costs to the consumer.

94.     Defendants' Agent, Mediamix365, placed the August 18, 2015 call to Plaintiff Katz on behalf of and for the benefit of Defendants.  Solar Nation is a fictitious business name for Mediamix365.

95.     Plaintiff Katz received numerous other calls from Defendants' Agents on behalf of and for the benefit of Defendants.

96.     On October 28, October 29, and November 2, 2015, Plaintiff Katz received a call from another local Massachusetts number. The caller identified itself as calling from "Solar America."  These calls were made by Defendants' Agent, Solar Media Team, on behalf of and for the benefit of Defendants.

97.     FTC consumer complaints against Sunrun show that consumers complain of receiving calls from the same local Massachusetts number even though they are on the national DNC list.

98.     After receiving these calls, in or about February 2016, Plaintiff Katz received an advertisement in the U.S. mail from Sunrun advertising solar products.  A copy of this advertisement is attached hereto as Exhibit 2.

99.     Prior to the calls, Plaintiff Katz had no contact with Defendants or their agents and did not consent to receive these telephone calls.

100.    The telephone numbers which showed up on Plaintiff Katz's phone as the calling number were, when called back, either non-operating numbers or numbers that have automated prompts that do not connect to a company representative.

101.    Plaintiff Katz was damaged by these calls. He found these repeated unsolicited calls to be intrusive and harassing, as they diverted attention away from his daily activities. Plaintiff Katz put himself on the national Do-Not-Call registry specifically to avoid

telemarketing calls. Plaintiff Katz's privacy was invaded when he received repeated calls from Defendants from different numbers. Plaintiff Katz's privacy was further invaded by intrusive questioning asking for personal information such as name, address, email, FICO score, among others.

**Plaintiff Jeffery Price's Individual Allegations**

102.     On or about July 27, 2003, Plaintiff Price placed his home number on the "national Do-Not-Call registry."

103.     Plaintiff Price received multiple calls from Defendants' Agent, Epath Media, in 2014 and again 2016, despite allegedly being placed on a Defendants' Do Not Call list in 2014.

104.     Epath Media uses the following fictitious business names, *inter alia*, when calling potential solar customers, including Plaintiff Price, on behalf of and for the benefit of Defendants: Clean Energy Foundation, Green Energy Association and Clean Energy Advocates.

105.     On March 28, 2014 Plaintiff Price received a call from a local California number to his home number. There was a long pause and electronic sounds or clicks before the caller started speaking. The caller identified herself as Kimberly at Clean Energy Foundation. The caller was offering solar installation estimates to reduce his utility bill. The caller solicited Plaintiff Price to have Solar America come to his home.

106.     On or about April 2, 2014 Plaintiff Price received a call from a local California number. There was a long pause and electronic sounds or clicks before the caller started speaking. The caller identified himself as Mike at Clean Energy Foundation and wanted to talk about lowering electricity bills by placing solar panels from Solar America on Plaintiff Price's roof. When Plaintiff Price asked who would install the panels, he was live transferred to a "supervisor," a Clean Energy Expert representative. This representative asked Plaintiff Price to waive his TCPA rights. Plaintiff Price refused and the line then went dead. He tried to call back the number but the call could not be completed.[5]

---

[5]     Consumers complaint of being harassed by unwanted calls marketing solar from EPath Media in a manner consistent with Plaintiff Price's experiences. *See e.g.*, http://800notes.com/Phone.aspx/1-858-272-9344 (last visited July 11, 2016); http://800notes.com/Phone.aspx/1-408-604-0017 (last visited July 11, 2016).

107.     On or about April 2, 2014, Plaintiff Price filed a complaint with the Better Business Bureau against Clean Energy claiming that the company continually makes telemarketing calls to his home after asking them to stop and that these calls occurred on multiple dates from February 1, 2014 through April 2, 2014.

108.     On or about August 18, 2014 Plaintiff Price received a call from a local California number. There was a long pause or electronic sounds or clicks before the caller started speaking. The caller identified herself as calling from Clean Energy Initiative.  The caller stated that Plaintiff Price had qualified for a solar rebate.  Plaintiff stated that he was on the national do not call registry and that he had, after two previous uninvited telemarketing calls, asked in writing to be added to the company's internal do not call list.  The caller then hung up.  (The writing by Plaintiff was correspondence sent through the U.S. Mail to Defendants with a pre-paid stamped and self-addressed return envelope.)

109.     On or about September 2, 2014, Plaintiff Price received a call from a local California number.  "UTILITIES" appeared on the caller ID. There was a long pause, no voice, and then the call automatically disconnected after about 10 seconds. Price tried to call the number back but the call could not be completed.

110.     On or about September 3, 2014, Plaintiff Price received a second call from a local California number.  "UTILITIES" appeared on the caller ID. The call began with a long pause, electronic sounds or clicks, followed up by a prerecorded message from the "Energy Relief Program." Then a caller identified herself as Brooke from Green Energy Association.  The caller stated that she represented a government solar program and wanted to qualify Plaintiff Price for a government rebate for free solar energy in his home.  The caller then apparently qualified Plaintiff Price for solar energy products and services by asking about his debt, FICO score, government assistance, shades on roof, among other information. The caller then asked Plaintiff Price to waive his rights under the TCPA for this and subsequent auto dialed calls from Solar America.  Plaintiff Price expressly refused to waive his rights.  After further communications, the caller hung up.  Price tried to call back the number but the call could not be completed.

111.     According to a consumer telemarketing complaint to the FCC, Green Energy

Association called the consumer's telephone numbers promoting solar products to be installed by "Solar America," even though that consumer was on the national Do Not Call list.

112.    On or about September 23, 2014 Plaintiff Price filed another telemarketing complaint against Solar America with the Business Consumer Alliance the ("BCA").  In the complaint, he demanded a copy of the company's written DNC Policy and to confirm in writing that the company has taken his residential number off the company's telemarketing call list.

113.    On September 24, 2014, the company responded to the BCA complaint as follows:

> Thank you for your feedback. Solar America is committed to compliance. To this end, please find the following:
> 1. Do Not Call Policy http://www.cleanenergyexperts.com/cee-dnc-policy/
> 2. DNC Status - your phone number has been added to our internal DNC list and we have emailed our third party call center partners to DNC your number above as well.
> 3. You can continue to mail us at the following: Clean Energy Experts 1601 N. Sepulveda Blvd., #227 Manhattan Beach, CA 90266 We apologize but we have not received any correspondence from you in the past otherwise we would have DNC'd you sooner per your request. Again, my apologies for the inconvenience.

114.    Despite having been placed on the Clean Energy's do not call list, on or about February 27, 2016, Plaintiff Price received a call from what he believed was a predictive auto dialer transfer because there was a long pause before the caller started speaking.  The caller identified herself as Laurie from Clean Energy Advocates, a "non-profit" organization.  The caller said she was trying to match residential customers to solar providers in order to take advantage of government rebates under a "Power Purchase Program." The caller initially stated that she was representing Sunrun, Inc. The caller told Plaintiff Price that he must average $150 a month in electric costs to qualify.  When Plaintiff Price did not qualify, the caller recommended other companies. The caller explained that information about those other companies was not on her computer screen and would need to come from another associate.

115.    The following day, Plaintiff Price e-mailed Sunrun and asked for a copy of the company's do not call policy and to be placed on the company's internal do not call list.

116.    On or about March 2, 2016 and March 15, 2016, Jeff Price received additional, uninvited calls from Clean Energy Advocates.  On the March 2 call, a representative claimed that

Clean Energy Advocates was a "non-profit" and provided a non-working telephone call back number. Plaintiff Price was then warm transferred to a "quality assurance representative" who asked Plaintiff Price to waive his TCPA rights, including any "do not call" rights and rights not to be called by its solar partners from automated dialing systems. Plaintiff Price expressly declined to waive these rights.

117. Prior to the above identified calls, Plaintiff Price had no contact with Defendants or Epath Media and did not consent to receive these telephone calls.

118. After receiving these calls, Plaintiff Price received an advertisement in the U.S. mail from Sunrun advertising solar products. See Exhibit 3.

119. The telephone numbers which showed up on Plaintiff Price's phone as the calling number were, when called back, either non-operating numbers or numbers that have automated prompts that do not connect to a company representative.

120. Plaintiff Price was damaged by these calls. He found these repeated unsolicited calls to be intrusive and harassing, as they diverted attention away from his daily activities. Plaintiff Price put himself on the national Do-Not-Call registry specifically to avoid telemarketing calls. Plaintiff Price's privacy was invaded when he received repeated calls from Defendants from different numbers. Plaintiff Price's privacy was further invaded by intrusive questioning asking for personal information such as name, address, email, FICO score, among others.

**Plaintiff Justin Birkhofer's Individual Allegations**

121. On or about July 18, 2008 Plaintiff Birkhofer registered his cellular telephone number on the National Do-Not Call registry.

122. In or about February 2016, Plaintiff Birkhofer began receiving unwanted calls on his cellular phone from a variety of telephone numbers. On each call, a sophisticated artificial voice would ask questions regarding solar services and products. These calls persisted through the following months at all times of the day.

123. On April 26, 2016, Plaintiff Birkhofer received another one of these calls. Frustrated, he answered the call in order to discover the identity of company that was harassing

him with incessant unwanted robocalls.  When he answered the call, he heard the same artificial voice promoting solar services and products.  Plaintiff Birkhofer stayed on the line and was transferred to a representative from Defendants' call center.  The call center representative was a live person.  During the call, the phone line was disconnected.

124.  The same representative immediately called Plaintiff Birkhofer back on his cellular telephone number. The representative called from Sunrun's telephone number: 855-478-6786.  See https://www.sunrun.com/contact-us (last visited June 29, 2016).

125.  Defendants' representative further stated that she was calling from Defendants' call center located in Scottsdale, Arizona.[6]  The representative attempted to set up an appointment for a Sunrun field representative to visit Plaintiff Birkhofer's home and to provide him with a solar consultation.

126.  Other individuals complain of receiving unwanted calls from Sunrun's telephone number: 855-478-6786.  For example, FTC complaints show that consumers on the National DNC list complained about multiple calls from Sunrun at that number during the Class Period. Online complaints state that Sunrun called individuals from that number without their permission and that there was "silence" on the phone line when they first picked up. See http://800notes.com/Phone.aspx/1-855-478-6786.

127.  Prior to the above-identified calls, Plaintiff Birkhofer had no contact with Defendants and their Agents and did not consent to receive these telephone calls.

128.  The telephone numbers which showed up on Plaintiff Birkhofer's phone as the calling number (except for Sunrun's number identified above) were, when called back, either non-operating numbers or numbers that have automated prompts that do not connect to a company representative.

129.  Plaintiff Birkhofer was damaged by these calls. He found these repeated unsolicited calls to be intrusive and harassing, as they diverted attention away from his daily

---

[6]    Defendants' call center is located in Scottsdale, Arizona.  *See* https://www.sunrun.com/about/solar-careers/job-postings/job/job?gnk=job&gni=8a36b7594d086b87014dabad18196bea (last visited June 29, 2015).

activities. Plaintiff Birkhofer put himself on the national Do-Not-Call registry specifically to avoid telemarketing calls. Plaintiff Birkhofer's privacy was invaded when he received repeated calls from Defendants from different numbers. Plaintiff's privacy was further invaded by intrusive questioning asking for personal information such as name, address, email, FICO score, among others.

## Class Certification Allegations

130. Class Definitions: Plaintiffs bring this Complaint against the Defendants, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and the following Classes:

**Robocall Cellular Class:**
All natural persons in the United States who received a non-emergency call from or on behalf of Defendants to their cellular phone through the use of an automatic telephone dialing system and/or an artificial or pre-recorded voice system, at any time within four years prior to the filing of the initial Complaint.

**Robocall Landline Class:**
All natural persons in the United States who received a non-emergency call from or on behalf of Defendants to their residential telephone line using an artificial or prerecorded voice to deliver a message, at any time within four years prior to the filing of the initial Complaint.

**National Do Not Call Class ("National DNC Class"):**
All natural persons in the United States whose telephone number was registered with the national Do-Not-Call registry for at least thirty days, who received more than one telephone call from or on behalf Defendants that promoted solar energy products or services within any 12-month period, at any time within four years prior to the filing of the initial Complaint.

**Company Do Not Call Class ("Company DNC Class"):**
All natural persons in the United States who requested that their telephone numbers be placed on Defendants' do not call list who received a call to their telephone by or on behalf of Defendants within four years prior to the filing of the initial Complaint.

**California Class:**
All natural persons in California who received a call from or on behalf of Defendants which played a prerecorded message(s) without an unrecorded, natural voice first informing the person answering of the name and organization of the caller and either the address or telephone number of the caller, and such call occurred within four years prior to the filing of the initial Complaint.

131. Excluded from the Classes are any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and Defendants' agents, legal

representatives, predecessors, successors, assigns, and employees.  Also excluded from the Classes are the judge and staff to whom this case is assigned, and any member of the judge's immediate family. Plaintiffs reserve the right to revise the Class definitions based on facts learned during discovery.

132.    **Class Numerosity:** The exact number of members of each Class is unknown and is not available to Plaintiffs at this time, but such information is readily ascertainable by Defendants and their Agents' call records and customer relations management databases. The Classes are so numerous that joinder of all members is impractical. Plaintiffs allege that there are more than 40 members of each Class.

133.    **Class Commonality:** Common questions of fact and law exist as to all members of the Classes and predominate over the questions affecting only individual members of the Classes. Identification of the individuals who qualify as a member of the Class will be sufficient to establish liability to the Class member. The predominant common questions include:

a.    Whether Defendants and/or their Agents used an "automatic telephone dialing system" or "artificial or prerecorded voice" with calls as such terms are defined or understood under the TCPA and applicable FCC regulations and orders;

b.    Whether Defendants are directly liable for their Agents' calls.

c.    Whether Defendants are vicariously liable for their Agents' calls.

d.    Whether Defendants and/or their Agents had written prior express consent to call class members;

e.    Whether Defendants and/or their Agents made telephone calls to members of the National DNC Class whose telephone numbers were registered with the national Do-Not-Call registry;

f.    Whether Defendants and/or their Agents instituted procedures for maintaining an internal do not call list pursuant to 47 C.F.R. § 64.1200(d)(3);

g.    Whether Defendants and/or their Agents maintain an internal do not call list and fail to honor request to be placed on such list.

h.    Whether Plaintiff and Class Members are entitled to damages, including whether Defendants' violations were performed willfully or knowingly such that Plaintiff and Class Members are entitled to treble damages;

i.    Whether Defendants and/or their Agents played a prerecorded message without an unrecorded, natural voice first informing the person answering

the phone of the name and organization of the caller and either the address or telephone number of the caller; and

j.    Whether Plaintiff and Class Members are entitled to injunctive relief for violations of their privacy and attorney's fees and costs.

134.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs are not different in any relevant way from any other member of the Classes, and the relief they seek is common to each Class.

135.    **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Classes: their interests do not conflict with the interests of the other class members. Plaintiffs have retained counsel competent and experienced in complex class actions, including class actions arising under the Telephone Consumer Protection Act and other consumer protection laws, and they intend to prosecute this action vigorously.

136.    **Predominance and Superiority:** The Classes alleged in this Complaint are appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by each individual member of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for Class members to individually obtain effective relief from Defendants' misconduct. Even if Class members themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, class actions present far fewer management difficulties and provide the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

137.    **Generally Applicable Policies**: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief

with respect to each Class a whole. The policies of the Defendants challenged herein apply and affect members of each Class uniformly, and Plaintiffs' challenge of these policies hinges on Defendants' conduct, not on facts or law applicable only to Plaintiffs.

138. **Injunctive Relief is Appropriate:** Based on information and belief, Defendants continue to engage in the improper practices discussed above. Injunctive relief is necessary and appropriate to enjoin Defendants' conduct and to prevent irreparable harm to Plaintiffs and Class members for which they have no adequate remedy at law.

**FIRST CLAIM**
**Violation of the TCPA Against All Defendants**
**by Plaintiffs Slovin, Katz, and Birkhofer**
**Individually and on Behalf of the Robocall Cellular Class**

139. Plaintiffs Slovin, Katz, and Birkhofer hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiffs assert this claim on behalf of themselves and the members of the Robocall Cellular Class.

140. The TCPA prohibits certain uses of telecommunication equipment that would interfere with telephone service subscribers' privacy and/or property rights with respect to their telephone. In particular, the TCPA provides that:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a . . . cellular telephone service . . .

47 U.S.C. § 27(b)(1)(A).

141. The TCPA provides telephone service subscribers a private right of action for injunctive relief and statutory damages for violations:

> A person or entity may . . . bring . . . an action based on a violation of [47 U.S.C. § 227(b)] to enjoin such a violation, an action to recovery for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or both . . . If the court finds that the defendant willfully or knowingly violated [47 U.S.C. § 227(b),] the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the [statutory damages available above].

47 U.S.C. § 227(b)(3).

142. Defendants make calls to consumers and others in the regular course of their business. Defendants called Plaintiffs and Class members' cellular telephone numbers.

143. Defendants placed calls to Plaintiffs and Class members using predictive dialers. The predictive dialers are an automatic telephone dialing system; no human manually entered the cellular telephone numbers which Defendants called at the time the call was made. Rather, the predictive dialers electronically dialed the Class members' cellular telephones in an automated fashion. The predictive dialers are capable of storing, producing, and dialing any telephone number, and are capable of storing, producing, and dialing telephone numbers using a random or sequential number generator. The predictive dialers otherwise constitute an "automatic telephone dialing system" under the meaning of 47 U.S.C. § 227(a)(1).

144. Defendants also utilized artificial and/or prerecorded voice messages in calls to cellular telephones of Plaintiffs and Class Members.

145. Defendants do not and did not obtain legally effective prior express consent to call the Class members' cellular telephone numbers.

146. Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii) by placing telephone calls to Plaintiffs and the other members of the Class that were automatically dialed by Defendants' telephone system and/or used an artificial or prerecorded voice; made to a cellular telephone number; and not as the result of the Class member's transaction with Defendants or its agents.

147. Defendants' violations are willful because Defendants knew that Plaintiffs and members of the Class had not given prior express consent to receive calls made using an automatic telephone dialing system, artificial, and/or prerecorded voice and that Defendants used these methods to call the cell phones of Plaintiffs and Class members.

148. Plaintiffs, individually, and on behalf of the other members of the Robocall Cellular Class, seek to recover statutory damages (including treble damages for willful violation of the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(b)(3), against Defendants.

**SECOND CLAIM**
**Violation of the TCPA Against All Defendants**
**by Plaintiff Price**
**Individually and on Behalf of the Robocall Landline Class**

149.     Plaintiff Price hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiff asserts this claim on behalf of himself and the members of the Robocall Landline Class.

150.     The TCPA prohibits certain uses of telecommunication equipment that would interfere with telephone service subscribers' privacy and/or property rights with respect to their telephone. In particular, the TCPA provides that:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B).

47 U.S.C. § 27(b)(1)(B).

151.     The TCPA provides telephone service subscribers a private right of action for injunctive relief and statutory damages for violations:

> A person or entity may . . . bring . . . an action based on a violation of [47 U.S.C. § 227(b)] to enjoin such a violation, an action to recovery for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or both . . . If the court finds that the defendant willfully or knowingly violated [47 U.S.C. § 227(b),] the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the [statutory damages available above].

47 U.S.C. § 227(b)(3).

152.     Defendants make calls to consumers and others in the regular course of their business. Defendants called Plaintiff and Class members' residential telephone numbers and used artificial and/or prerecorded voice messages to communicate with Plaintiffs and the Class Members.

153.     Defendants do not and did not obtain legally effective prior express consent to call the Class members' cellular telephone numbers.

154. Defendants' calls were made for commercial purposes. They were not made for emergency purposes or to collect a debt owed to or guaranteed by the Unites States.

155. Defendants' violations are willful because Defendants knew that Plaintiff and members of the Class had not given prior express consent to receive calls made using an artificial or prerecorded voices to deliver a message.

156. Plaintiff, on his own behalf, and on behalf of the other members of the Robocall Landline Class, seeks to recover statutory damages (including treble damages for willful violation of the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(b)(3), against Defendants.

**THIRD CLAIM FOR RELIEF**
**Violations of the TCPA Against All Defendants**
**by Plaintiffs Slovin, Katz, Price, and Birkhofer**
**Individually and on Behalf of the National DNC Class**

157. Plaintiffs Slovin, Katz, Price, and Birkhofer hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiffs assert this claim on behalf of themselves and members of the National DNC Class.

158. 47 U.S.C. §227(c) provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object.

159. The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

160. 47 C.F.R. § 64.1200 (e), provides that § 64.1200 (c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, 'Rules and Regulations Implementing the Telephone Consumer Protection Act of

1991,'" which the Report and Order, in turn, provides as follows:

> The Commission's rules provide that companies making telephone solicitations to residential telephone subscribers must comply with time of day restrictions and must institute procedures for maintaining do-not-call lists. For the reasons described above, we conclude that these rules apply to calls made to wireless telephone numbers. We believe that wireless subscribers should be afforded the same protections as wireline subscribers.

Report and Order at ¶ 167.

161.    Defendants violated 47 C.F.R. § 64.1200 (c) by initiating telephone solicitations to wireless and residential telephone subscribers such as Plaintiffs and the Class members who registered their respective telephone numbers on the national Do-Not-Call registry, a listing of persons who do not wish to receive telephone solicitations that is maintained by the federal government.

162.    These individuals requested not to receive calls from Defendants, as set forth in 47 C.F.R. § 64.1200 (d)(3).

163.    Defendants did not have an established business relationship with the Plaintiffs and Class Members.

164.    Defendants made more than one unsolicited telephone call to Plaintiffs and members of the Class within a 12-month period without their prior express consent to receive such calls. Plaintiffs and members of the Class never provided any form of consent to receive telephone calls from Defendants and/or Defendants do not have a current record of consent to place telemarketing calls to them.

165.    Defendants violated 47 U.S.C. § 227(c)(5) because Plaintiffs and the Class received more than one telephone call within a 12-month period made by or on behalf of the Defendants in violation of 47 C.F.R. § 64.1200, as described above. As a result of Defendants' conduct as alleged herein, Plaintiffs and the Class suffered actual damages and, under section 47 U.S.C. § 227(c), are each entitled, inter alia, to receive up to $500 in damages for such violations of § 64.1200.

166.    To the extent Defendants' misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages

recoverable by the members of the Class.

**FOURTH CLAIM FOR RELIEF**
**Violations of the TCPA, 47 U.S.C. § 227**
**Against All Defendants by Plaintiffs Slovin, Katz, Price, and Birkhofer**
**Individually and on Behalf of the Company DNC Class**

167.    Plaintiffs Slovin, Katz, Price, and Birkhoker hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiffs assert these claims on behalf of themselves and members of the Company DNC Class.

168.    The TCPA's implementing regulation 47 C.F.R. § 64.1200(d)(3) provides that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(1)  Written policy. Persons or entitles making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request . . . .

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further

telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made."

169.     The TCPA creates a private right of action for injunctive and monetary relief for any "person who has received more than one telephone call within any 12–month period by or on behalf of the same entity in violation of the [TCPA] regulations." 47 U.S.C. § 227(c)(5); see also 47 C.F.R. § 64.1200(d)(3) (liability for company specific DNC list violations).

170.     Defendants violated 47 C.F.R. § 64.1200(d)(3) by initiating calls for telemarketing purposes to residential and wireless telephones of Plaintiffs and members of the Company DNC Class without instituting minimum procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of Defendants.

171.     Defendants did not institute minimum procedures in violation of § 64.1200 (d)(3) as Defendants have a uniform policy and practice of failing to honor Plaintiffs and members of the Company DNC Class' requests to be placed on the Defendants and their Agents' Do Not Call lists and failing to provide Plaintiffs and members of the Company DNC Class with the name of the individual caller, the name on whose behalf the call is being made, and a working telephone number or address at which the company may be contacted.

172.     Plaintiffs and members of the Company DNC Class received more than one call from or on behalf of Defendants within a twelve-month period after requesting to be placed on the Defendants' internal do not call list.

173.     These calls were received within five years from the date Plaintiffs and members of the Company DNC Class' requested to be placed on the company specific do not call list.

174.     Plaintiffs and members of the Company DNC Class did not have an established business relationship with the callers at the time of the calls.

175.     Plaintiffs and members of the Company DNC Class did not consent to receive calls from Defendants.

176.     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Company DNC Class were harmed.

177.     Pursuant to 47 U.S.C. §227(c)(5), Plaintiffs, individually, and on behalf of the other members of the Company DNC Class, seek to recover statutory damages (including treble

damages for willful violation of the TCPA), as well as injunctive and equitable relief against Defendants.

**FIFTH CLAIM FOR RELIEF**
**Violations of the Consumers Legal Remedies Act,**
**California Civil Code Section 1750, *et seq.,***
**On Behalf of Plaintiff Price and the California Class**

178.     Plaintiff Price hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint. Plaintiff asserts this claim on behalf of himself and members of the California Class.

179.     The California Consumer Legal Remedies Act, Section 1750 of the California Civil Code, protects consumers against unfair and deceptive business practices.

180.     Civil Code section 1770, subdivision (a) provides in part:

> The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful: ... (22)(A) Disseminating an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message.

181.     Defendants' calls to Plaintiff Price and members of the California Class violated and continue to violate the Consumer Legal Remedies Act by disseminating unsolicited prerecorded messages by telephone to Plaintiffs and Class Members' residential and cellular numbers.

182.     These calls did not begin with an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller.

183.     Defendants did not obtain the consent of Plaintiff Price and Class members to listen to the prerecorded messages.

184.     At the time the calls were made, Plaintiff Price and members of the California Class had no established relationship with Defendants or their Agents and were neither business associates nor customers of Defendants or their Agents.

185.    These calls were not made for the purpose of collecting an existing obligation from Plaintiff Price and members of the Class.

186.    The calls were not generated at the request of Plaintiff Price and members of the California Class.

187.    The calls were intended to result in the sale or lease of solar energy goods and/or solar energy services to a consumer.

188.    As a proximate and direct result of Defendants' conduct, Plaintiff and members of the California Class have been injured and suffered damages in that their privacy was invaded and they were harassed by numerous, unwanted robocalls.  Plaintiff Price spent time and money writing to Defendants and lodging complaints with consumer agencies, and incurred costs for sending mail to Defendants with a request to be placed on Defendants' internal do not call lists and requests for Defendants to cease and desist the calls.

189.    Pursuant to section 1782(a) of the California Civil Code, Plaintiff Price, on behalf of himself and the California Class seek a Court order enjoining Defendants from such future conduct and any other such orders that may be necessary to rectify the unlawful business practices of Defendants, including requiring Defendants to cease using prerecorded messages in their telemarketing campaigns.

190.    Pursuant to section 1782(a) of the California Civil Code, Plaintiff Price, on behalf of himself and the California Class seek reasonable attorneys' fees and costs.

191.    Plaintiff brings this action as a private attorney general, and to vindicate and enforce an important right affecting the public interest. Plaintiff is therefore entitled to an award of attorneys' fees under California Code of Civil Procedure section 1021.5 for bringing this action.

WHEREFORE, Plaintiffs pray that the Court enter judgment and orders in their favor and against Sunrun, Clean Energy, and Does 1 to 5 as follows:

   a.    An order certifying the classes, directing that this case proceed as a class action, and appointing Plaintiffs and their counsel to represent the classes;

   b.    Judgment against Defendants, and in favor of Plaintiffs and the other class members in the amount of $1,500 per violation of the TCPA as proven at trial;

c.   Equitable and injunctive relief, including injunctions enjoining further violations of the TCPA and the CLRA;

d.   An order granting costs and attorneys' fees; and

e.   Such other and further relief as this Court may deem appropriate.

Dated: July 12, 2016

By:  /s/David C. Parisi
David C. Parisi
dcparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
Santa Monica, CA  90405
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Yitzchak H. Lieberman (SBN 277678)
ylieberman@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
7400 Hollywood Blvd, #505
Los Angeles, CA 90046
Telephone: (917) 657-6857
Facsimile:  (877) 501-3346

Grace E. Parasmo (admitted pro hac vice)
gparasmo@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
3304 Avenue K
Brooklyn, NY 11210
Telephone: (646) 509-3913
Facsimile:  (877) 501-3346

*Attorneys for Plaintiffs Lynn Slovin, Samuel Katz, Jeffery Price, and Justin Birkhofer on their own behalf, and on behalf of all others similarly situated.*

# JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: July 12, 2016

By: ____/s/David C. Parisi_____
David C. Parisi
dcparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
Santa Monica, CA   90405
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Yitzchak H. Lieberman (SBN 277678)
ylieberman@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
7400 Hollywood Blvd, #505
Los Angeles, CA 90046
Telephone: (917) 657-6857
Facsimile:  (877) 501-3346

Grace E. Parasmo (admitted pro hac vice)
gparasmo@parasmoliebermanlaw.com
PARASMO LIEBERMAN LAW
3304 Avenue K
Brooklyn, NY 11210
Telephone: (646) 509-3913
Facsimile:  (877) 501-3346

*Attorneys for Plaintiffs Lynn Slovin, Samuel Katz, Jeffery Price, and Justin Birkhofer on their own behalf, and on behalf of all others similarly situated.*

Jury Demand

# DECLARATION OF DAVID C. PARISI

I, David C. Parisi, hereby declare on oath as follows:

1.      I am an attorney licensed to practice law in the state of California. I am over the age of 18 years and I have personal knowledge of the matters attested to herein. If called upon to testify, I would and could competently do so.

2.      I make this declaration pursuant to California Civil Code section 1780(d) on behalf of my client, Plaintiff Jeffery Price, on behalf of himself and all others similarly situated.

3.      Defendant Sunrun, Inc. Delaware corporation with its principal place of business in San Francisco, California. It maintains a registered agent for service of process at 818 West Seventh Street, Suite 930, Los Angeles, CA 90017 and is doing business in the state of California.

4.      Defendant Clean Energy Experts, LLC is California limited liability company in San Francisco, California.  It maintains its registered agent for service of process at 818 West Seventh Street, Suite 930, Los Angeles, CA 90017 and is doing business in the state of California.

5.      The transaction or any substantial portion of the transaction occurred in Ventura County.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this 12th day of July 2016 at Venice, California.


_____/s/David C. Parisi_____
David C. Parisi